## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| GULNAR THAWAR, | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| | § | |
| 7-ELEVEN, INC., | § | |
| *Defendant*. | § | |

## COMPLAINT

Plaintiff Gulnar Thawar complains of Defendant 7-Eleven, Inc. ("7-Eleven" or "Company"), and in support shows the following:

### Nature of Case

1.      7-Eleven had in its possession, custody, or control the personal identifying and financial information ("PII") of Thawar, one of its employees. During Thawar's employment unknown person(s) accessed, stole, and used Thawar's PII without Thawar's permission.

2.      During her employment, Thawar made multiple reports to 7-Eleven about its failure to safeguard her PII, as well as the PII of other current and former employees. The Company ignored Thawar's reports. Instead, 7-Eleven reacted negatively to Thawar's reports and opted to "shoot the messenger," sometimes going so far as to threaten Thawar's job and even her physical safety for bringing such inconvenient news to the Company's attention. Ultimately, the Company succeeded in getting rid of Thawar.

3.      Thawar is suing 7-Eleven because the Company failed to protect her PII, because

**Complaint**                                                                                               **Page 1**

one of 7-Eleven's managers committed civil battery against her, because 7-Eleven discriminated/retaliated against her in violation of the Family and Medical Leave Act, because 7-Eleven failed to provide her with a timely COBRA notification, and because 7-Eleven claims it "lost" Thawar's tangible personal property, including but not limited to a Quran, which is a book of deep personal and religious significance to Thawar. Thawar brings these grievances against 7-Eleven by means of the following seven (7) claims:

*Count One*. Discrimination/retaliation in violation of the Family and Medical Leave Act, 29 U.SC. §§2601 *et seq.* ("FMLA"), where the serious health condition at issue involves injuries that Thawar sustained as a result of a fall that took place on January 23, 2015.

*Count Two*. Discrimination/retaliation in violation of the FMLA, where the serious health condition at issue involves what one of Thawar's treating physicians called a "Major Depressive Disorder, *etc.*"

*Count Three*. Violation of the notice requirements found in 29 U.S.C §1166 of the Employee Retirement Income Security Program.

*Count Four.* Conversion of tangible personal property belonging to Thawar, including but not limited to her Quran.

*Count Five*. Civil battery which a 7-Eleven supervisor named Mark Markovic committed on the afternoon of Friday, January 23, 2015.

*Count Six.* Negligence for failing to secure Thawar's PII.

*Count Seven.* Negligent misrepresentation in connection with Thawar's PII.

**Parties**

4.       Plaintiff Gulnar Thawar is an individual. She resides in Carrollton, Denton County, Texas, and she has resided at that address at all times relevant to this action.

5.       Defendant 7-Eleven, Inc. ("7-Eleven" or "the Company") is a domestic company. It may be served with process by serving its **registered agent**, which is **CT Corporation**

**System, located at 350 North St. Paul Street in Dallas Texas 75201**.

## Jurisdiction

6.      This Court has subject-matter jurisdiction over this lawsuit because Thawar's claims present federal questions pursuant to 28 U.S.C. §1331.

7.      This Court has supplemental jurisdiction over Thawar's claims brought under Texas state law by reason of 28 U.S.C. §1367(a).

8.      This Court has *in personam* jurisdiction over 7-Eleven because the Company's headquarters is located in Texas, because the Company does business in Texas, and because Thawar's claims all arose in Texas.

## Venue

9.      Venue is proper in this district and division because 7-Eleven's headquarters is in this district and division, and because a substantial part of the events forming the basis of Thawar's claims occurred in this district and division. 28 U.S.C. §1391(b)(2).

## Material Facts

### BACKGROUND ON 7-ELEVEN

10.      7-Eleven is a convenience store chain.

11.      7-Eleven operates more than 55,800 stores in 16 countries around the word.

12.      7-Eleven is privately held and is a wholly owned subsidiary of Seven-Eleven Japan Co., Ltd. in Tokyo, Japan.

13.      7-Eleven's headquarters is located at One Arts Plaza 1722 Routh St., Suite 1000 Dallas, Texas 75201 (hereinafter "Corporate Headquarters").

14.      7-Eleven had a number of policies and procedures in place between July 20, 2012

**Complaint**                                                                                          **Page 3**

and March 1, 2015, including the following –

        A.    "Information Security Standards" which, according to 7-Eleven, applies to all "employees, contractors, consultants, temporary personnel and other persons, whether employed by the Company or a third party, using the Company's computer or networking resources (including in-bound dial-up access to the Company's network)."

        (1)    Section 5.5 of these "Information Security Standards" is entitled "encryption." In this section 7-Eleven states, "All non-public information which is not physically protected should be encrypted by an approved encryption technique such as Triple Data Encryption Standard (3DES) on systems that have encryption capability. Microsoft Windows 2000 and Windows XP have an option to enable Encrypted File System (EFS). This feature should be enabled by default on these platforms after procedures have been implemented to administer password recovery."

### BACKGROUND ON THAWAR

15.    Before beginning her employment with 7-Eleven, Thawar worked with Hewlett Packard. In that capacity Thawar performed services for the benefit of 7-Eleven.

16.    7-Eleven hired Thawar as a full-time employee effective July 21, 2012.

17.    Upon hiring Thawar 7-Eleven assigned Thawar the following job title – Senior Quality Assurance (Information Technology).

18.    Upon hiring Thawar 7-Eleven assigned Thawar to work at its Corporate Headquarters.

19.    Thawar relied on 7-Eleven's policies and procedures, including those referenced in Paragraph 14.A *supra.*

**Complaint**                                          **Page 4**

20.     In February 2014 Thawar's last name was "Ali." Thawar took the last name "Thawar" as a result of getting married.

### THAWAR DISCOVERS THAT 7-ELEVEN IS NOT KEEPING HER PII SECURE

21.     On December 22, 2014 Gulnar conducted a so-called "user acceptance" or "UAT" meeting. This meeting was for 7-Eleven employees whose jobs included user acceptance testing.

22.     The meeting referenced in paragraph 21 took place at Corporate Headquarters.

23.     One of the attendees of the UAT meeting referenced in paragraph 21 was a 7-Eleven employee named Mr. Barry Krause.

24.     Also attending the UAT meeting referenced in paragraph 21 were three individuals who were not 7-Eleven employees. Instead, they were from Cognizant, which is an outside vendor. The names of these three individuals are Messrs. Gaurav Singhal Gaurav, Saikat Sinhmahappra Gaurave Kraue, and Sanjeev Thakur.

25.     During the meeting Thakur had his lap top open, and Thakur also stated out loud Thawar's home address and Social Security number. Thawar then walked over to Thakur and looked at Thakur's laptop screen. Thawar saw that Thakur had on his laptop screen all sorts of PII on Thawar – for example, Thawar's Social Security number, her bank accounts, even information on Thawar's children.

26.     Thawar then asked Thakur what else he was viewing. Thakur responded by showing Thawar one of the many screens that he, Thakur, had open on his laptop. The screen that Thawar saw contained Thawar's name plus certain prescription medicines that Thawar was taking at the time.

**Complaint**                                                                                       **Page 5**

27.     What was on Thakur's screen shocked and alarmed Thawar. That is because **Thakur and outside vendors like him were not supposed to be able to access such information**. 7-Eleven had a policy – or at least 7-Eleven previously represented to Thawar and others that it had a policy – stating that such PII was to be encrypted. *See* paragraph 14.A *supra*. Manifestly, 7-Eleven had not done this.

28.     Thawar then emailed her "project team," as well as her immediate and second-line supervisors, and relayed to them what had just happened.

A.      At this time Thawar's immediate supervisor was Ms. Jennifer Gordon. Gordon's title was Quality Assurance Manager.

B.      At this time Thawar's second-line supervisor was Mr. Mark Markovic. Markovic's title was Manager, Quality Assurance.

29.     In her email Thawar to her "project team," Thawar stated, among other things, that she was not "comfortable" with Thakur being able to look at her personal information.

30.     Another member of the project team, Mr. Thai Tran, responded to Thawar's email by emailing the following response to Thawar -- "*this data should have been scrubbed*." In other words, data should have been encrypted to safeguard Thawar's PII.

31.     Tran also emailed the following to Thawar -- "*This is more of a Richard Russell question*." That is because, Tran continued, Oracle "*has information on everyone*."

A.      At the time of Tran's email, 7-Eleven employed Mr. Richard Russell. Russell's title at 7-Eleven was Oracle Project Architect and Support Services Manager. Among other things, Russell had the authority, on behalf of 7-Eleven, to give outside vendors like Thakur access to 7-Eleven employees' PII.

**Complaint**                                                                                                    **Page 6**

32.     Unlike Tran, Gordon did not respond to Thawar's email.

33.     Unlike Tran, Markovic did not respond to Thawar's email.

34.     Thawar later discovered that 7-Eleven had not only failed to secure her PII, the Company had also failed to secure the PII of more than 2,000 current and former employees.

35.     The gravity of 7-Eleven's security breach was not mere theory, nor was it some sort of academic exercise. That point was driven home to Thawar on December 23, 2014, *i.e.,* one day after the UAT meeting referenced in Paragraph 21 *supra.* On that day Thawar, while she was working from her home by means of a virtual private network ("VPN") token, received a suspicious call from an unknown, blocked number. The caller on the other end began mocking Thawar. More ominously, the caller on the other end recited Thawar's full social security number, **all nine digits**, during the course of the telephone call. Later that same day Thawar received a second call from an unknown, blocked caller. This second caller asked Thawar if Thawar was "*stressed out*" because of the prior call – where, as previously discussed, an unidentified individual had recited all nine digits of Thawar's full social security number.

36.     Thawar continued to receive more calls like those referenced in Paragraph 35.

37.     Later, Thawar learned that one or more individuals had applied for jobs using her identity.

38.     In January 2015, Thawar received two invoices at her home. Both were fraudulent. One was from a jewelry company in India. Another was from a bank in India; this bank stated that Thawar owed more than $50,000.

*THAWAR REPORTS 7-ELEVEN'S SECURITY BREACH,*
*TO WHICH 7-ELEVEN RESPONDS WITH INDIFFERENCE AND HOSTILITY*

39.     Thawar brought 7-Eleven's security breach to the Company's attention.

40.     Thawar brought 7-Eleven's security breach to the Company's attention on more than one occasion.

41.     Thawar brought 7-Eleven's security breach to the Company's attention on multiple occasions.

42.     Thawar brought 7-Eleven's security breach to the attention of the following personnel at the Company: (a) Thawar's direct supervisor; (b) Human Resources; (c) 7-Eleven's Chief Executive Officer; (d) 7-Eleven's Legal Department; and (e) 7-Eleven's so-called Compliance Hotline (800.711.2757).

A.      Thawar had a telephone conversation with Markovic on the morning of December 26, 2014. During this conversation Markovic told Thawar the following: (i) that partners/vendors have "access production," which includes employees' PII; (ii) that partners/vendors are under a nondisclosure agreement ("NDA"), are bonded, and are liable for any misuse; (iii) and, that partners/vendors will continue to have access to employees' PII and Thawar has nothing to worry about.

B.      Markovic's statements, referenced in subpart "A" of this paragraph, contradict 7-Eleven policy – specifically, Information Security Standards Company Policy 5.4.3.2. This policy provides, among other things, that application development staff should not normally have access to production systems.

43.     No one referenced in Paragraph 42 ever squarely or directly denied the fact of the

Company's security breach that Thawar had reported (although someone named Gabrielle Kleper from Spelberger Law Group did aver to Thawar that "*7-Eleven denies any wrongdoing*").

44.     No one referenced in Paragraph 42 ever squarely or directly denied the fact of the Company's security breach that Thawar had reported (although someone named Gabrielle Kleper from Spelberger Law Group did aver to Thawar that "*7-Eleven denies any wrongdoing*"). To the contrary, in an email dated January 6, 2015, a 7-Eleven employee named Brian Guthrie, whose job title is program manager – Guthrie was ranked higher at 7-Eleven than Thawar -- transmitted an email to Thawar which reads, at least in part, as follows:

> *So to assist, and to make sure I fully understand, it appears to me that a few people in CTS have an elevated permission in Oracle ERP application (perhaps an [sic] it is an [sic] specific admin permission that has been assigned to them) that allows your personal data to be displayed.*
> *For example:*
> *Inside Oracle ERP, you have standard users… Then you have HR users… And you have Payroll users. Each of them have [sic] 3 different levels of permisssions [sic] to view specific attributes inside Oracle ERP.*
> *From what I'm gathering is [sic] that we are using to test with [sic]. Which means CTS users are able to sign-in and see you [sic] information, my info, everyone's info for that matter. But I also saw where the data should have been 'scrubbed'. Which would have prevented this from happing [sic]. Do I have this understanding correct? If so, we have MUCH bigger problems.*

45.     On Monday, January 12, 2015, Guthrie transmitted the following IM to Thawar:

> *It's my understanding that Russell approved CTS to have a . . . It's my understanding that Russell approved CTS to have access to L2IT. This was a requirement so they could test Oracle Test Cases. Such as, HR name change (like you got married), or phone number changing, or whatever that an employee can change on their HR record, that's being captured by IDM. There are NO test cases in Q.C. that would require CTS to view/test/verify Dependent Info, Pay Rates, Home Address, and Personal Benefits Enrollment data. Meaning, there is NO business.*
> *[R]eason CTS should be looking at this data, because there are no test cases. The bottom line is that their Oracle L2IT user account was given TOO much access and they can view this data. What should have happened is this: Their Oracle*

**Complaint**                                                                 **Page 9**

*user ID should have been given 'limited access' only. This is the problem.*
*That's a good question as to when the access will be reduced. Honestly I don't*
*know if Richard [Russell] knows what's going on. If he does know, he may choose*
*to do nothing until a manager or director emails him asking for him to take away*
*access from CTS. If he has no clue, someone really needs to reach out to him and*
*let him know that CTS has too much access, and that he needs to remove some of*
*their access.*

46.     In a conversation held at Corporate Headquarters on the afternoon of Friday, January 16, 2015, Russell, referring to Thawar's reports about 7-Eleven's security breaches, told Thawar to "*keep it silent*."

47.     In the same conversation as the one referenced in Paragraph 46, Russell told Thawar that "*the situation is not going to change*."

48.     Also in the same conversation as the one referenced in Paragraph 46, Russell told Thawar that if Thawar "*has a problem*" with what 7-Eleven is or is not doing with PII, then Thawar "*can look for another job*."

49.     Finally, and more ominously, in the same conversation as the one referenced in Paragraph 46, Russell warned Thawar that if Thawar took her reports about PII outside the Company, then Thawar would "*face the consequences*."

50.     On Thursday, January 22, 2015, Thawar completed what 7-Eleven calls security awareness training. During this training 7-Eleven informed Thawar that so-called employee restricted data must be encrypted and masked, and that the reason for doing this is security.

    A.     Later on that same day Thawar transmitted the following email to Gordon:

*As per my understanding, we are using real all 7-eleven employee restricted data*
*which includes all types of personal information with un-encrypted and un-*
*masked data for testing purpose [sic] for [the] past 25 years.*

*Just wondering, if we plan on having data encrypted in future?*

**Complaint**                                                                                            **Page 10**

*For some reason, since my information was called out during the project 7TAIM UAT session, I have been paranoid [as] well as depressed for [the] past couple days. That is the reason, [sic] I'm asking.*

B.     Minutes later, Gordon replied to Thawar with the following email – "*Hi Alley, I do have the answer to your question. I can forward your question to Mark [Markovic] if you like.*"  However, when Thawar then asked Gordon if she would "*please share*" her answer, Gordon forwarded Thawar's query to Markovic. **In other words, Gordon never bothered to answer Thawar, even though Gordon claimed to "*have the answer*.**"

51.     On the afternoon of Friday, January 23, 2015, Markovic got so angry with Thawar's reports about 7-Eleven's security breach that he grabbed Thawar by the shoulders and shook Thawar.

52.     On the afternoon of Friday, January 23, 2015, Markovic got so angry with Thawar's reports about 7-Eleven's security breach that he grabbed Thawar by the shoulders and shook Thawar. Thawar was shocked and offended by Markovic's behavior towards her.

53.     Thawar reported Markovic's behavior, referenced in Paragraphs 51 and 52, to Gordon.

54.     Thawar reported Markovic's behavior, previously referenced in Paragraphs 51 and 52, to Gordon on Friday, January 23, 2015.

55.     Thawar reported Markovic's behavior, previously referenced in Paragraphs 51 and 52, to Gordon on Friday, January 23, 2015 via email.

56.     Thawar reported Markovic's behavior, previously referenced in Paragraphs 51 and 52, to Gordon on Friday, January 23, 2015 via email, and in that same email Thawar also asked

**Complaint**                                                                                           **Page 11**

Gordon to call her.

57.     Thawar reported Markovic's behavior, previously referenced in Paragraphs 51 and 52, to Gordon on Friday, January 23, 2015 via email, and in that same email Thawar also asked Gordon to call her. However, despite Thawar's request, Gordon never responded.

**THAWAR BEGINS TO SUFFER HEALTH PROBLEMS,**
**WHICH THE COMPANY EXPLOITS TO REMOVE THAWAR FROM ITS PAYROLL**

58.     Later that same day, *i.e.,* January 23, 2015, Thawar fell from her car.

59.     Later that same day, *i.e.,* January 23, 2015, Thawar fell from her car while she was at her home.

60.     Later that same day, *i.e.,* January 23, 2015, Thawar fell from her car while she was at her home, and as a result Thawar suffered injuries to her head (especially her jaw and right ear), as well as to her right leg, right arm, and back.

61.     Thawar reported Markovic grabbing and shaking her, previously referenced in Paragraphs 51 and 52, to Gordon a second time, this time on Sunday, January 25, 2015.

62.     Thawar reported Markovic grabbing and shaking her, previously referenced in paragraphs 51 and 52, to Gordon a second time, this time on Sunday, January 25, 2015 via email.

63.     Thawar reported Markovic grabbing and shaking her, previously referenced in Paragraphs 51 and 52, to Gordon a second time, this time on Sunday, January 25, 2015 via email, and in that same email Thawar also asked Gordon to call her.

64.     Thawar reported Markovic grabbing and shaking her, previously referenced in Paragraphs 51 and 52, to Gordon a second time, this time on Sunday, January 25, 2015 via email, and in that same email Thawar also asked Gordon to call her. However, despite Thawar's

request, Gordon never responded.

65.     On Monday, January 26, 2015, Thawar saw a psychiatrist named Dr. Sejal Mehta.

66.     On Monday, January 26, 2015, Thawar saw a psychiatrist named Dr. Sejal Mehta, who at the time officed at Psychiatric Medical Associates, P.A. located at 6404 International Parkway, #2100, Plano, Texas  75093.

67.     On Tuesday, January 27, 2015, Thawar saw Dr. Martin G. McElva.

68.     On Tuesday, January 27, 2015, Thawar saw Dr. Martin G. McElva, who at the time officed at Neighborhood Medical Center located at 5917 Beltline Road in Dallas, Texas 75254.

69.     On Tuesday, January 27, 2015, Thawar saw Dr. Martin G. McElva, who at the time officed at Neighborhood Medical Center located at 5917 Beltline Road in Dallas, Texas 75254 for the pain in her arms and legs which Thawar had begun experiencing when she fell from her car, as described in Paragraphs 56 – 58 *supra.*

70.     On Tuesday, January 27, 2015, Thawar saw Dr. Martin G. McElva, who at the time officed at Neighborhood Medical Center located at 5917 Beltline Road in Dallas, Texas 75254. During this visit Dr. McElva signed a note stating that he had seen Thawar on this day and that Thawar may return to work on February 2, 2015. *See* **Exhibit A**.

71.     Thawar transmitted **Exhibit A** to Gordon.

72.     Thawar transmitted **Exhibit A** to Gordon via email.

73.     Thawar transmitted **Exhibit A** to Gordon, some time after which Gordon transmitted an email back to Thawar acknowledging her, *i.e.,* Gordon's, receipt of same.

74.     On January 28, 2015, Thawar saw a certain Dr. Sandya Narayan at Monarch

Dental, located at 2540 Old Denton, Road, Suite 188 in Carrollton, Texas 75006.

75.     On January 28, 2015, Thawar saw a certain Dr. Sandya Narayan at Monarch Dental, located at 2540 Old Denton, Road, Suite 188 in Carrollton, Texas 75006 as a result of pain in her jaw, which Thawar began experiencing when she fell from her car, as described in Paragraphs 58 – 60 *supra.*

76.     On January 28, 2015, Thawar saw a certain Dr. Sandya Narayan at Monarch Dental, located at 2540 Old Denton, Road, Suite 188 in Carrollton, Texas 75006. During this visit Narayan signed a note stating that he had seen Thawar on this day, and that Thawar may return to work on February 12, 2015. *See* **Exhibit B**.

77.     Thawar transmitted **Exhibit B** to Gordon.

78.     Thawar transmitted **Exhibit B** to Gordon via email.

79.     Thawar transmitted **Exhibit B** to Gordon, some time after which Gordon transmitted an email back to Thawar acknowledging her, *i.e.,* Gordon's, receipt of same.

80.     On the morning of Thursday, January 29, 2015, Thawar received an email from Ms. Carol Barbero ("Barbero"), 7-Eleven's HR manager.

81.     On the morning of Thursday, January 29, 2015, Thawar received an email from Barbero. The email reads in pertinent part as follows:

> *I understand from your Manager, Jennifer Gordon, that you will be out the next 2 weeks.*
>
> *Attached is the contact information for UNUM who manages our Leave of Absence process. Please call them and explain to them your situation to see if you qualify for a medical leave of absence such as Short Term Disability or FMLA. UNUM will work with your health care providers in obtaining additional information and then update us in HR as to the status of your claim and anticipated return to work date.*

**Complaint**                                                                                      **Page 14**

82.     On February 3, 2015, Dr. Mehta signed a note which stated, in part, that Thawar was "being treated for the diagnosis of Major Depressive Disorder Mild Recurrent type and ADD. . . ." *See* **Exhibit C**.

  A.     Thawar's date of birth is redacted from **Exhibit C**. *See generally* FED. R. CIV. P. 5.2(a)(2).

83.     Thawar transmitted **Exhibit C** to Gordon.

84.     Thawar transmitted **Exhibit C** to Gordon via email.

85.     Thawar transmitted **Exhibit C** to Gordon, some time after which Gordon transmitted an email back to Thawar acknowledging her, *i.e.,* Gordon's, receipt of same.

86.     After being continuously out of work since January 27, 2015, Thawar returned to work at Corporate Headquarters on Thursday, February 12, 2015.

87.     After being continuously out of work since January 27, 2015, Thawar returned to work at Corporate Headquarters on Thursday, February 12, 2015. Thawar did this in compliance with a note from one of her doctors. *See* **Exhibit B**.

88.     After being continuously out of work since January 27, 2015, Thawar returned to work at Corporate Headquarters on Thursday, February 12, 2015. Thawar did this in compliance with a note from one of her doctors that Thawar had previously tendered to Gordon. *See* Paragraph 79 *supra*.

89.     Upon her arrival at work on the morning of Thursday, February 12, 2015, Thawar went to her cubicle and saw that somebody had defaced a photo of her husband and her.

90.     Thawar brought the issue of the defaced photo, referenced in Paragraph 89, to Gordon's attention.

91.     Thawar brought the issue of the defaced photo, referenced in Paragraph 89, to Gordon's attention, and Gordon responded by telling Thawar that she, Gordon, was not interested in hearing in any complaints from Thawar.

92.     In mid to late morning on Thursday, February 12, 2015, Thawar met with Ms. Jennifer Lee ("Lee").

93.     In mid to late morning on Thursday, February 12, 2015, Thawar met with Lee. The meeting took place at Corporate Headquarters.

94.     On February 12, 2015, Lee's job title at 7-Eleven was "LOA Specialist."

95.     In mid to late morning on Thursday, February 12, 2015, Thawar met with Lee. During the meeting Lee discussed with Thawar, among other things, the FMLA.

96.     In mid to late morning on Thursday, February 12, 2015, Thawar met with Lee. During the meeting Lee made a verbal statement, as the word "statement" is defined in FED. R. EVID. 801(a), to Thawar that Thawar was covered by the FMLA.

97.     Some time during the morning of Thursday, February 12, 2015, Thawar advised Gordon that she was going to work from her home.

98.     Some time during the morning of Thursday, February 12, 2015, Thawar advised Gordon that she was going to work from her home, and in response Gordon told Thawar that that was "acceptable" (Gordon's word).

99.     Thawar spent the afternoon of Thursday, February 12, 2015 working from her home via VPN.

100.    On Friday, February 13, 2015, Thawar worked from her home via VPN.

101.    On Friday, February 13, 2015, Thawar emailed Gordon and asked Gordon if she, Thawar, could "*work next week and [the] week after that from home.*"

102.    Thawar worked from home via VPN on the following dates: Monday, February 16, 2015; Tuesday, February 17, 2015; Wednesday, February 18, 2015; and, Thursday, February 19, 2015.

103.    On Monday, February 16, 2015, Barbero responded to Thawar's email referenced in Paragraph 101 *supra*. Barbero did not answer Thawar's question directly. Instead, Barbero told Thawar to "*rest and return when you are able.*"

104.    On Monday, February 16, 2015, Barbero responded to Thawar's email referenced in Paragraph 101 *supra*. Barbero did not answer Thawar's question directly. Instead, Barbero told Thawar to "*rest and return when you are able.*" Gordon later echoed Barbero's words; Gordon did this in an email to Thawar on February 18, 2015.

105.    On Wednesday, February 18, 2015, Guthrie transmitted the following email to Thawar:

> *Agreed that data may be used for testing as a result of production oracle ERP data being sync'ed to test or [sic[ uat environments. However, in order to view this data inside ERP, the user account that CTS is using has been given elevated permission to view this data inside ERP application. Again, for some reason, the Oracle ERP application owners have approved this account to have this access. So if it's being improperly used, that goes back to the NDA agreement that we have with CTS. It's a violation of the agreement which should and needs to be addressed with our Legal Department.*

106.    On the afternoon of Wednesday, February 18, 2015, Gordon sent an email to Thawar.

**Complaint**                                                                                                              **Page 17**

107.    On the afternoon of Wednesday, February 18, 2015, Gordon sent an email to Thawar. A true and correct copy of what Gordon emailed to Thawar – again, the email was dated February 18, 2015 -- is attached hereto as **Exhibit D**.

      A.    **Exhibit D** itself is dated February 16, 2015.

108.    On the afternoon of Wednesday, February 18, 2015, Gordon sent an email to Thawar. A true and correct copy of what Gordon emailed to Thawar – again, the email was dated February 18, 2015 -- is attached hereto as **Exhibit D**. Among other things, **Exhibit D** caused Thawar to perceive that 7-Eleven was changing her job duties.

109.    At 8:54 a.m. on Feb. 20, 2015, Thawar emailed Gordon and withdrew her request to work from home, referenced in Paragraph 101.

110.    At 8:54 a.m. on Feb. 20, 2015, Thawar emailed Gordon and withdrew her request to work from home, referenced in Paragraph 101. Thawar also advised Gordon that she would return to work – *i.e.,* go to Corporate Headquarters -- on Monday, February 23, 2015.

111.    At 9:11 a.m. on February 20, 2015, Barbero emailed Gordon and Markovic, telling them both – "***Do not respond to any of [Thawar's] e-mails, texts or IM's. We will take it from here***."

112.    At 9:35 a.m. on February 20, 2015, Barbero emailed Thawar. In the email Barbero stated, in part, "*We have not received documentation showing that you are able to return to work. **Until we receive this documentation, we cannot allow you to work**.*" (Emphasis added). In that same email, Barbero also stated the following:

> *At this time you are an inactive employee. You do not have any job duties or obligations until you are approved to return to work. Pursuant to Company policy for a leave of absence your 7-Eleven email and access will be turned off until that*

*time. During this time, we ask that you refrain from contacting your manager or team members via text, IM, phone or email. . . .*

*Should you have any questions during this process you may contact me directly.*

    A.    Barbero did not identify any such 7-Eleven policy in her email to Thawar.

    B.    Thawar is currently unaware of any such 7-Eleven policy.

113.    On Friday, February 20, 2015, Thawar discovered, per the email quoted in Paragraph 112, that her VPN token had been turned off.

114.    On the afternoon of Friday, February 20, 2015, Thawar made two separate email responses to Barbero's email quoted in part in Paragraph 112. In her two responses, Thawar stated that she was "*a very good employee of seven eleven*," and that she did not "*appreciate*" Barbero making her an "*inactive employee*."

115.    Between February 20 and 27, 2015, Thawar emailed Barbero at least twice.

116.    Between February 20 and 27, 2015, Thawar emailed Barbero at least twice. In those emails Thawars asked for access to her system.

117.    Between February 20 and 27, 2015, Thawar emailed Barbero at least twice. In those emails Thawars asked for access to her system. Barbero did not respond.

118.    On February 27, 2015 Thawar transmitted an email to Gordon, a true and correct copy of which is attached hereto as **Exhibit E**.

    A.    Thawar's personal email is redacted from **Exhibit E**.

119.    On March 2, 2015 7-Eleven responded by transmitting to Thawar the letter that is attached as **Exhibit F**.

    A.    Thawar's personal address is redacted from **Exhibit F**.

*EVENTS POST-SEPARATION*

120.    Thawar applied to the Texas Workforce Commission ("TWC") for unemployment benefits.

121.    Thawar applied to the TWC for unemployment benefits some time after February 27, 2015 but before March 8, 2015.

122.    Thawar applied to the TWC for unemployment benefits some time after September 27, 2015 but before March 8, 2015, and some time thereafter 7-Eleven advised the TWC that it did not oppose.

123.    7-Eleven never pursued an appeal within TWC where it made any "statement," as that word is defined in FED. R. EVID. 801(a), that it opposed Thawar receiving unemployment benefits.

124.    On April 30, 2015 Thawar transmitted an email to one of 7-Eleven's attorneys. Thawar's email reads in pertinent part as follows: "*I'm still waiting to receive company benefits/COBRA separation through mail[]( it's been over 2 months and I have not received it)*."

125.    Later on April 30, 2015, 7-Eleven, by and through one of its attorneys, transmitted an email to Thawar which reads in pertinent part as follows: "*We have no problem with you meeting [a 7-Eleven employee] to . . . get your personal items.  Please do so.  Thank you for contacting us about this*."

126.    On May 1, 2015 Thawar transmitted an email to one of 7-Eleven's attorneys. Thawar's email reads in pertinent part as follows: "*Also, I'm still waiting to receive company benefits/COBRA separation through mail. (It's been over 2 months and I have not received It) - please send them to me*."

127.    Later on May 1, 2015, 7-Eleven, by and through one of its attorneys, transmitted an email to Thawar which reads in pertinent part as follows: "[*O]ur records show that you were mailed a COBRA notice on March 12, 2015*." However, Thawar never received the COBRA notice.

128.    Thawar emailed a 7-Eleven attorney reiterating her desire to retrieve her personal items from 7-Eleven. Thawar did this on May 7 and 18, 2015, as well as on June 22, 2015.

129.    On June 22, 2015 7-Eleven, by and through one of its attorneys, transmitted an email to Thawar which reads in pertinent part as follows: "*Thank you for the additional information regarding the whereabouts of your personal items. We have been unable to locate any additional items to date, but we are still looking. . . . We are looking into your requests and concerns and will provide a complete response to your June 18, 2015, correspondence this week*."

130.    On June 29, 2015 7-Eleven, by and through one of its attorneys, transmitted an email to Thawar which reads in pertinent part as follows: "*[W]e looked in the locked cabinet and your old cube/area for your personal belongings. Nothing was found. A detailed search was completed -- the furniture was pulled out to see if anything may have fallen behind or could possibly be hidden. Every locked cabinet was checked and there simply is nothing there. No Quran, photos or other belongings were found. 7-Eleven does not have any of your personal belongings*."

131.    Thawar did eventually receive 7-Eleven's COBRA notice, but she received it in June 2015 after one of 7-Eleven's attorneys sent it to her via email.

132.    The deadline for Thawar to enroll pursuant to COBRA to ensure continuation

coverage was in May 2015.

133.    As a result of conduct by 7-Eleven, including the foregoing, Thawar has suffered economic losses.

134.    As a result of conduct by 7-Eleven, including the foregoing, Thawar has suffered economic losses, and in all likelihood Thawar will continue to suffer such economic losses in the future.

135.    As a result of conduct by 7-Eleven, including the foregoing, Thawar has suffered mental anguish.

136.    As a result of conduct by 7-Eleven, including the foregoing, Thawar has suffered mental anguish, and in all likelihood Thawar will continue to suffer such mental anguish in the future.

## Count One – FMLA Discrimination/Retaliation
### Serious Health Condition: Injuries Suffered From Fall on January 23, 2015

137.    Thawar re-alleges and incorporates by reference the allegations set forth in paragraphs 10 through 136.

138.    Thawar was an "*eligible employee*," as that phrase is used in 29 U.S.C. §2611(2), at all times from January 23, 2015 through the end of her employment with 7-Eleven.

139.    Thawar was an "*eligible employee*," as that phrase is used in 29 C.F.R. §825.110, at all times from January 23, 2015 through the end of her employment with 7-Eleven.

140.    7-Eleven was an "*employer*," as that word is used in 29 U.S.C. §2611(4)(A)(i), at all times from January 23, 2015 through the end of Thawar's employment there.

141.    7-Eleven was a "*covered employer*," as that phrase is used in 29 C.F.R. §825.104,

at all times from January 23, 2015 through the end of Thawar's employment there.

142.    Some or all of the injuries that Thawar sustained on January 23, 2015 as a result of her fall – namely, injuries to her head (especially her jaw and right ear), as well as to her right leg, right arm, and back (*see* Paragraphs 58 – 60) – qualify as a "*serious health condition*" as that phrase is defined in 29 U.S.C. §2611(11).

143.    Some or all of the injuries that Thawar sustained on January 23, 2015 as a result of her fall – namely, injuries to her head (especially her jaw and right ear), as well as to her right leg, right arm, and back (*see* Paragraphs 58 – 60) – qualify as a "*serious health condition*" as that phrase is defined in 29 C.F.R. §825.113.

144.    Title 29 U.S.C. §2615(a)(2) states, "*It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter*." The U.S. Department of Labor interprets this statutory provision as prohibiting employers from terminating employees for having exercised or attempting to exercise their FMLA rights. 29 C.F.R. §825.220(c).

145.    7-Eleven violated the FMLA – specifically, 29 U.S.C. §2615(a)(2) and 29 C.F.R. §825.220(c) -- as follows:

>    A.    Thawar engaged in activity that is protected by the FMLA – specifically, Thawar received continuing treatment for injuries that she sustained on January 23, 2015 as a result of her fall – namely, injuries to her head (especially her jaw and right ear), as well as to her right leg, right arm, and back (*see* Paragraphs 58 – 60) – by one or more health care providers (29 U.S.C. §§2611(6) &

(11)(B));

B.     After the activity described in subpart A, 7-Eleven committed multiple adverse employment actions, including the following: (i) cutting off Thawar's access to her computer system; (ii) stopping Thawar from working, even though 7-Eleven had previously received written notification from one or more of Thawar's health care providers that Thawar was able to return to work; (iii)  cutting short Thawar's two-week notice; and (iv) discharging, or alternatively, constructively discharging, Thawar.

C.     There is a causal link between subparts A and B.

146.     Thawar has been prejudiced by 7-Eleven's conduct referenced in Paragraph 145. Accordingly, 7-Elven is liable to Thawar for any wages, salary, employment benefits, or other compensation denied or lost by reason of 7-Eleven's violation of the FMLA. 29 U.S.C. §2617(a)(1)(A)(i)(I). 7-Eleven is also liable to Thawar for any actual monetary losses sustained by Thawar as a direct result of the Company's violation. *Id*. at §2617(a)(1)(A)(i)(II). Finally, Thawar is entitled to all equitable relief as may be appropriate, including employment, reinstatement, or, alternatively, front pay. *Id*. at §2617(a)(1)(B).

147.     Thawar is also entitled to an award of liquidated damages. *Id.* at §2617(a)(1)(A)(iii).

148.     Thawar is entitled to recover reasonable attorney fees and costs. 29 U.S.C. §2617(a)(3).

149.     Thawar is entitled to pre-judgment and post-judgment interest. 29 U.S.C.

§2617(a)(1)(A)(ii).

## Count Two – FMLA Discrimination/Retaliation
### Serious Health Condition: "Major Depressive Disorder, *etc.*"

150.    Thawar re-alleges and incorporates by reference the allegations set forth in paragraphs 10 through 136.

151.    Thawar was an "*eligible employee*," as that phrase is used in 29 U.S.C. §2611(2), at all times from January 26, 2015 through the end of her employment with 7-Eleven.

152.    Thawar was an "*eligible employee*," as that phrase is used in 29 C.F.R. §825.110, at all times from January 26, 2015 through the end of her employment with 7-Eleven.

153.    7-Eleven was an "*employer*," as that word is used in 29 U.S.C. §2611(4)(A)(i), at all times from January 26, 2015 through the end of Thawar's employment there.

154.    7-Eleven was a "*covered employer*," as that phrase is used in 29 C.F.R. §825.104, at all times from January 26, 2015 through the end of Thawar's employment there.

155.    Thawar's "Major Depressive Disorder," *etc.*, diagnosed on January 26, 2015 – *see* Paragraph 82 -- qualifies as a "*serious health condition*" as that phrase is defined in 29 U.S.C. §2611(11).

156.    Thawar's "Major Depressive Disorder," *etc.,* diagnosed on January 26, 2015 – *see* Paragraph 8 -- qualifies as a "*serious health condition*" as that phrase is defined in 29 C.F.R. §825.113.

157.    Title 29 U.S.C. §2615(a)(2) states, "*It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter*." The U.S. Department of Labor interprets this statutory

provision as prohibiting employers from terminating employees for having exercised or attempting to exercise their FMLA rights. 29 C.F.R. §825.220(c).

158.    7-Eleven violated the FMLA – specifically, 29 U.S.C. §2615(a)(2) and 29 C.F.R. §825.220(c) -- as follows:

A.    Thawar engaged in activity that is protected by the FMLA – namely, Thawar received continuing treatment for her "Major Depressive Disorder," *etc.* by one or more health care providers (29 U.S.C. §§2611(6) &   (11)(B));

B.    After the activity described in subpart A, 7-Eleven committed multiple adverse employment actions, including the following: (i) cutting off Thawar's access to her computer system; (ii) stopping Thawar from working, even though 7-Eleven had previously received written notification from one or more of Thawar's health care providers that Thawar was able to return to work; (iii)  cutting short Thawar's two-week notice; and (iv) discharging, or alternatively, constructively discharging, Thawar.

C.    There is a causal link between subparts A and B.

159.    Thawar has been prejudiced by 7-Eleven's conduct referenced in Paragraph 158. Accordingly, 7-Eleven is liable to Thawar for any wages, salary, employment benefits, or other compensation denied or lost by reason of 7-Eleven's violation of the FMLA. 29 U.S.C. §2617(a)(1)(A)(i)(I). 7-Eleven is also liable to Thawar for any actual monetary losses sustained by Thawar as a direct result of 7-Eleven's violation. *Id.* at §2617(a)(1)(A)(i)(II). Finally, Thawar

is entitled to all equitable relief as may be appropriate, including employment, reinstatement, or, alternatively, front pay. *Id*. at §2617(a)(1)(B).

160.    Thawar is also entitled to an award of liquidated damages. *Id.* at §2617(a)(1)(A)(iii).

161.    Thawar is entitled to recover reasonable attorney fees and costs. 29 U.S.C. §2617(a)(3).

162.    Thawar is entitled to pre-judgment and post-judgment interest. 29 U.S.C. §2617(a)(1)(A)(ii).

### Count Three – Violation of 29 U.S.C. §1166

163.    Thawar re-alleges and incorporates by reference all allegations set forth in paragraphs 10 through 136.

164.    7-Eleven is liable to Thawar for failing to provide her with timely notice of her right to elect continuation coverage as required by 29 U.S.C. §1166.

165.    Thawar seeks reimbursement from 7-Eleven for any and all medical expenses she has incurred during the appropriate time period, as well as statutory penalties under 29 U.S.C. §1132(c).

166.    Thawar is also entitled to attorney's fees, costs of suit, and pre-judgment and post-judgment interest.

### Count Four – Conversion

167.    Thawar re-alleges and incorporates by reference all allegations set forth in paragraphs 10 through 136.

168.    The Company is liable for conversion as follows:

**Complaint**                                                                                     **Page 27**

A.       Thawar owned, possessed, or had the right to immediate possession of the following, all of which is tangible, personal property – a Quran that had been in her family for several generations; family photos; eyeglasses; a laptop that was owned by Thawar, not by the Company; a tablet that was owned by Thawar, not the Company; and, a folder that contained notes that Thawar had kept and prepared relating to her identity theft allegations. This includes the two invoices from India referenced in Paragraph 38. For purposes of this Count Four, the foregoing shall be referenced collectively as the "Property."

B.       The Company wrongfully exercised dominion or control over the Property identified in subparagraph A in a manner that was inconsistent with Thawar's rights.

C.       Assuming for argument's sake only that Company is found to have legally acquired the Property referenced in subparagraph A, which Thawar denies, then Thawar pleads that she has demanded return of the Property.

D.       The Company has failed to return the Property, alleging instead that it "*does not have any of [Thawar's] personal belongings.*"   *See* Paragraph 130.

E.       Thawar has suffered injury as a result of no longer possessing the Property.

169.    As a result of the Company's conduct set forth in this pleading, including Paragraph 168, Thawar seeks to recover damages for the lost value of the Property. In the event the Company "finds" the Property, notwithstanding its statements to Thawar to the contrary, Thawar seeks return of the Property plus damages for her loss of use while the Property was in the Company's possession.

170.    Thawar seeks punitive damages because the Company's wrongful acts were of a wanton and malicious nature.

171.    Thawar seeks recovery of all interest, both pre-judgment and post-judgment, that is lawfully available to her.

172.    Pursuant to TEX. R. CIV. P. 131, Thawar seeks recovery of all costs she incurs in connection with this lawsuit.

### Count Five – Battery

173.    Thawar re-alleges and incorporates by reference all allegations set forth in paragraphs 10 through 136.

174.    On the afternoon of January 23, 2015, Markovic was employed by the Company.

175.    On the afternoon of January 23, 2015, Markovic was on the Company's payroll as a manager of the following work unit of 7-Eleven – "Quality Assurance."

176.    On the afternoon of January 23, 2015, Markovic had the authority, in the interest of 7-Eleven, to discipline employees within the work unit at 7-Eleven known as "Quality Assurance."

177.    On the afternoon of January 23, 2015, Markovic had the authority, in the interest of 7-Eleven, to effectively recommend discipline of employees within the work unit of 7-Eleven known as "Quality Assurance."

178.    7-Eleven is liable for battery. On the afternoon of January 23, 2015, the Company, by and through Markovic, intentionally or knowingly engaged in contact with Thawar's person/body in a manner that a reasonable person would view as both offensive and insulting. Because personal indignity is the essence of Count Five, Thawar is not required to prove that she suffered any actual physical injury.

179.    Thawar seeks all damages that are available to her under this tort. This includes

damages for mental anguish.

180.    Thawar seeks punitive damages because 7-Eleven's wrongful acts were of a wanton and malicious nature.

181.    Thawar seeks recovery of all interest, both pre-judgment and post-judgment, that is lawfully available to her.

182.    Pursuant to TEX. R. CIV. P. 131, Thawar seeks recovery of all costs she incurs in connection with this lawsuit.

## Count Six – Negligence

183.    Thawar re-alleges and incorporates by reference all allegations set forth in paragraphs 10 through 136.

184.    7-Eleven owed a duty of care to Thawar to ensure that her PII was not used for any improper purpose.

185.    7-Eleven breached its duty of care to Thawar to ensure that its PII was not used for improper purposes. 7-Elven did this by failing to provide adequate protections to Thawar's PII and by allowing the PII to be accessed, in unencrypted format, by third persons.

186.    As a direct and proximate result of 7-Eleven's acts and omissions, alleged above, Thawar suffered damages.

187.    Thawar seeks recovery of all interest, both pre-judgment and post-judgment, that is lawfully available to her.

188.    Pursuant to TEX. R. CIV. P. 131, Thawar seeks recovery of all costs she incurs in connection with this lawsuit.

## Count Seven – Negligent Misrepresentation

189.    Thawar re-alleges and incorporates by reference all allegations set forth in paragraphs 10 through 136.

190.    7-Eleven is liable for negligent misrepresentation as follows:

A.    7-Eleven made a representation to Thawar in the course of its business or in a transaction in which 7-Eleven had an interest. *See e.g.,* Paragraph 14.A.

B.    7-Eleven supplied the false information referenced in subpart A of this paragraph for the guidance of others, including Thawar.

C.    7-Eleven did not exercise reasonable care or competence in communicating the information.

D.    Thawar justifiably relied on 7-Eleven's representation.

E.    7-Eleven's negligent misrepresentation proximately caused injury to Thawar.

191.    As a direct and proximate result of 7-Eleven's acts and omissions, alleged above, Thawar suffered damages, for which Thawar sues.

192.    7-Eleven's conduct, as described hereinabove, was both fraudulent and malicious as defined by Section 41.001(6) and (7) of the Texas Civil Practice and Remedies Code. Accordingly, Thawar is entitled to recover exemplary damages pursuant to Section 41.003 of the Texas Civil Practice and Remedies Code.

193.    Thawar seeks recovery of all interest, both pre-judgment and post-judgment, that is lawfully available to her.

194.    Pursuant to TEX. R. CIV. P. 131, Thawar seeks recovery of all costs she incurs in

**Complaint**                                                                                                                    **Page 31**

connection with this lawsuit.

## Jury Demand

195.    In accordance with FED. R. CIV. P. 38(b)(1), Thawar hereby demands a jury on all

issues so triable.

## Request for Relief

Based on the foregoing, Plaintiff Gulnar Thawar asks that Defendant 7-Eleven, Inc.

appear and answer, that Thawar have final judgment against Defendant as set forth herein, and

for all such other and further relief to which Thawar may be justly entitled.

Dated: August 16, 2015

Respectfully submitted,

*s/ Wade A. Forsman*

By:_____

**Wade A. Forsman**
State Bar No. 07264257
P.O. Box 918
Sulphur Springs, TX 75483-0918
Tel.: 903.689.4144 East Texas
Tel.: 972.499.4004 Dallas Fort Worth
Fax: 903.689.7001
wade@forsmanlaw.com

**Attorney for Plaintiff Gulnar Thawar**

1/27/2015

Gulnar Thawar has been under my care for _____ day/s.

She may return to work/school on __2__ / __2__ / __15__ with no / the following

restrictions _____

**Neighborhood Medical Center**
5917 Beltline Road
Dallas, TX 75254
972-726-6464
972-726-6444

**RETURN TO WORK/SCHOOL**

Martin G. McElya

Provider Signature                Provider Name

Exhibit A

To Whom This May Concern:

Please excuse _Gulnar Thawar_.

This patient was seen in our office on _01|28|15_

and should return to work/school on _02|12|15_.

If you have any questions, please feel free to contact our offices.

Thank you!

Dr.: _____

**Monarch Dental**
*Smiles for Everyone!*

Dental Office: _____
2540 Old Denton RD, Suite 188
Carrollton, TX  75006

Phone #: _____

©2006 BND Services. Inc.

BN  117   Rev.  11/06

# Exhibit B

**Psychiatric Medical Associates, P.A.**
6404 International Parkway # 2100
Plano, TX 75093
Phone (972) 267-1988
Fax (972)-267-3434

02/03/2015

To Whom It May Concern:

GULNAR ALI (_____) is currently a patient here at Psychiatric Medical Associates. This patient is being treated for the diagnosis of Major Depressive Disorder Mild Recurrent type and ADD and patient's last appointment was on 01/26/2015.

Please feel free to call if you have any further questions.

Thank you.

Sincerely,

SEJAL MEHTA, M.D. / GOPAN PILLAI, PMHNP-BC
Psychiatric Medical Assoicates, P.A.

# Exhibit C

February 16, 2015

**RE: Potential Need for Accommodation or Job Modification**

Dear Ali Gulnar:

The Human Resources department has been made aware of your request to work from home for a couple of weeks based on your situation.  In order for us to determine if your situation does require such accommodation or job modification, I have enclosed documents for you to complete along with your physician: Teammate Request for Job Modification and Interactive Process Questionnaire. In order to assist you and your physician further I have also enclosed a copy of the job description for Quality Assurance Senior Business Analyst.

You will have seven calendar days from the date of this letter to complete and submit the enclosed directly to me via e-mail: carol.barbero@7-11.com.  Should you need additional time for completion please contact me. Should you fail to return the documents within the request timeframe and/or fail to request additional time, I will consider this matter closed and no accommodation or job modification will be necessary for you to perform the essential functions of your position.

Please contact the undersigned with any questions you may have.

Sincerely,

Carol Barbero
HR Business Partner

cc: Jennifer Gordon

Enc.:   Teammate Request for Job Modification
        Interactive Process Questionnaire
        Quality Assurance Senior Business Analyst Job Description

# Exhibit D

## TEAMMATE REQUEST FOR JOB MODIFICATION

*This is a confidential form and will be submitted by the requesting applicant/employee directly to Human Resources along with a completed Interactive Process Questionnaire (enclosed). Only employees are expected to complete workplace information.*

**NAME:** _____   **DATE OF REQUEST:** _____

**WORK LOCATION:** _____

**POSITION:** _____

**SUPERVISOR/DEPARTMENT HEAD:** _____

**REASON FOR REQUEST FOR JOB MODIFICATION:** _____
_____

**REQUESTED/SUGGESTED MODIFICATION:** Please describe the accommodations you believe are needed to enable you to perform the essential functions of this job.
_____
_____
_____
_____
_____

**PHYSICIAN CONTACT INFORMATION** Please provide name, address, telephone and fax numbers. The physician may receive a letter/fax from the Company requesting information on your impairment/disability and recommendations for accommodations.

Name of Physician: _____

Address of Physician: _____

Telephone Number of Physician: _____ Fax: _____

Email Address of Physician (if available): _____

*I authorize the release of necessary confidential medical information regarding my disability from treating physician to Human Resources. I further authorize the release of necessary confidential medical information regarding my disability to relevant managers/ hiring managers as deemed necessary by Human Resources. I also attest to the fact that a copy of the position description has been given to me for review and reference.*

**Teammate Signature:** _____

**Date:** _____

Enc.:   Interactive Process Questionnaire

        Job Description

# INTERACTIVE PROCESS QUESTIONNAIRE

All questions contained in this questionnaire are strictly confidential.

| Employee Name (Last, First, M.I.): | Position: |
|---|---|
| Physician Name: | Physician Phone Number: |

Please answer and return the following questionnaire to your patient within the time frame indicated. The questionnaire format is a guide and we would appreciate a response to every question. We need your complete medical opinion, so please feel free to include a more detailed narrative response to any and all questions if needed to answer more fully. Thank you for your anticipated cooperation.

**IMPORTANT NOTE TO HEALTH CARE PROVIDER:** When answering these questions, please do not take into consideration any ameliorative effects of mitigating measures, such as medications, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies; use of assistive technology; reasonable accommodations or auxiliary aids or services; or learned behavioral or adaptive neurological modifications.

**1.   Does the above named employee have a physical or mental impairment?**

| | Please explain the impairment: | Expected Duration: |
|---|---|---|
| **Yes** | | |
| **No** | | |

**2.   If you answered "Yes" to #1, does this impairment substantially limit any major life activities?**

| | Which major life activity or activities are limited?: | Expected Duration: |
|---|---|---|
| **Yes** | | |
| **No** | | |

**3.   For each major life activity that is limited by the impairment, please describe how the above named employee is restricted as to the condition, manner or duration under which that activity can be performed, as compared to the way in which most people in the general population can perform the activity.**

4. What is the expected duration of the above named employee's impairment?

5. Please review the attached Job Description in which the above named employee is currently employed. Is the above named employee able to perform all job functions?

| Yes | | |
|---|---|---|
| | Which job functions cannot be performed: | Why? |
| No | | |

6. Please describe any reasonable accommodations you recommend that would allow the above named employee to be able to perform those job functions:

7. If medical leave is one of the possible accommodations listed above, please provide the estimated duration for the leave and reason for this leave:

8. Would performing any of the job functions listed result in a direct safety or health threat to this employee or other people (co-workers, members of the general public, etc.)?

| | Please describe: | |
|---|---|---|
| | • Which job function(s) would pose such a threat: | Expected Duration: |
| Yes | | |

| | | |
|---|---|---|
| | • **The Direct safety or health threat posed:** | **Expected Duration:** |
| • | • **Any reasonable accommodation you recommend that would eliminate the direct safety or health threat, or reduce it to what you view as an acceptable level:** | **Expected Duration:** |
| **No** | | |


_____

Signature of Physician


_____

Title of Physician


_____

Date Questionnaire Completed

| **Printed or Stamped Name, Address and Phone Number of Physician:** |
|---|
| |



# Job Description

| Title/Grade: | Quality Assurance Senior Business Analyst | | Job Code: 59964 | Grade: 24 |
|---|---|---|---|---|

Eval Date:   5/14/2012                                  Job Family:  IT

FLSA:   Exempt                          Reports To Position:        IT Manager Quality Assurance

## General Description:

The Quality Assurance Senior Business Analyst (QASBA) is responsible for managing projects for quality verification and validation of the organization's software releases.  The QASBA ensures software meets agreed customers' requirements prior to release.  The QASBA establishes the software quality strategy for the organization including guidelines for testing, defect reporting, and verification of defect resolution.

## Duties and Responsibilities:

Manage Testing Activities with Projects, Partners, and Users: Motivate and work with a variety of individuals and cultures. Coordinate with other groups to accomplish organization's objectives. Work with the product development team to design for testability, plan testing and plan other quality assurance activities. Coordinate and manage all test efforts with multiple partners and vendors (on and off shore). Coordinate and manage all test efforts with the Business community. Coordinate, manage, and track efforts within the Q&A team's priorities, ensuring milestones are met within defined budgets and schedules. Document and report quality assurance test findings to project/program mgrs, development team, follow up on ongoing test activities. Reviewing Test Deliverables: Review and approve test plans for system testing, integration testing, and acceptance testing. Review, track, and maintain quality test plans and schedules. Define and work within the priorities as a quality team member. Work within the quality effort for the entire software lifecycle. Coordinate and lead reviews. Process Improvement: Engage in quality assurance and process improvement activities. Assist in the design and implementation of new quality assurance test methods and procedures. Act as an advocate for quality in the organization.

## Knowledge, Skills and Abilities:

Education:    Experience: 5 years, Test. Expertise in quality methodology including knowledge of process to build quality into software Expertise in the use and interpretation quality metrics. Experience in a structured testing environment; Familiarity with or experience executing testing methods using industry standard testing tools; troubleshooting and monitoring testing of a QA team.. Experience with Agile as well as Waterfall test methodologies; Familiar with .NET, SOA, and other development environments; Demonstrate excellent written and verbal communications.. Understand software development, testing, and management principles; See the ôBig Pictureö, but understand the picture's details; Clearly express concepts to technical and non-technical individuals.. Identify, analyze, and report issues and defects to management and customers; Manage and work in an Outsourced environment; Manage multiple projects at one time; Be proactive, self starter.

## Physical Requirements:

Kneeling not required, Stooping not required, Walking not required, Standing not required, Bending not required, Repetitive Motion not required, Floor To Waist Requirements: , Waist To Shoulder Requirements: , Overhead Lifting not required, Carrying items 20 feet not required

-------------------------------------------
On Fri, 2/27/15, ENARA ALI <███████████████wrote:

Subject: Gulnar Thawar_ 2 Weeks Notice
To: "Jennifer.Gordon@7-11.com" <Jennifer.Gordon@7-11.com>
Date: Friday, February 27, 2015, 9:47 AM

Hello, Jennifer -

I'm writing to announce my resignation from 7-, effective
two weeks from this date.

This was not an easy decision to make, because enjoyed
working with 7-11, specially with you

Jennifer - Thank you for the opportunities for growth that
you have provided me. You are a great person and a great
boss.

With the recent situation, where my personal information was
called out without my consent in front of other people, has
leaded me to many damages and harm in my life for and for
future.
I had made many, many attempts to work with you guys, for
resolving these issues.

In result outcome, I was being Ignored and put into false
light many times on going with my complaints. When I became
hopeless, I then reached out to 3rd party. ( i know you guys
were very upset about this)

Having 3rd party involve with 7-11 made my situation worse.
I guess, I was wrong for standing up for myself.

Suddenly I was being treated differently at work, as I use
to be treated well before I got 3rd party involve. And now
this situation has made my health condition worse.

I did not appreciate being treated with adverse decision
from HR well as the management , just for having engaged in
protected activity.

Exhibit E



I wish I never had hired the 3rd party law firm, which
surely could've avoided discrimination and negative
treatments. (I guess learned my lesson, as to how
being engaged in protected activity impact my work
environment negativity).

Here is the response from 7-11 attorneys with my claims and
my complaints

"With respect to her claim about her personal information,
7-Eleven denies any wrongdoing.  As far as we can tell,
she is complaining about her information being maintained in
7-Eleven's internal personnel system.  This is not a
violation of the law"

I know that above statement is wrong. but i cant take the
pain any more.

At this point, as corporate employees I feel much empowered
to voice my concerns, especially in a leadership
organizational. This environment makes me now feel, un-safe
hostile work environment.

I do ask that I get paid for my last year bonus this year,
as I have worked very hard. And during the 2 weeks notice I
like to use my 2 weeks' vacation.
Since the 2 weeks I took off, I had already applied for
medical leave.

I will continue with my struggle of finding a new job, which
a such a critical health condition I hold.

Sincerely,
Gulnar Thawar
Jennifer – Take Care



March 2, 2015

Ms. Alley Gulnar Thawar

Dear Alley,

We received your e-mail dated February 27, 2015, in which you voluntarily resigned your employment with 7-Eleven. We accept your voluntary resignation, and we are not asking that you remain available to work for 7-Eleven any longer. Accordingly, your employment with 7-Eleven is terminated, effectively immediately. Your official last day of employment will be February 27, 2015. On March 5, 2015, you will receive a final paycheck, for the pay period of February 13, 2015, to February 26, 2015. You have exhausted all of your paid time off ("PTO"), and actually have a negative PTO balance. No unused PTO is due to your upon separation.

Enclosed is the company's Benefits Upon Separation document for review. Your benefits with 7-Eleven are terminated as of the last day with the company, February 27, 2015. A COBRA enrollment eligibility packet will be sent to your home address within 30 days. There will be no gap in your coverage if you select and pay the COBRA premium.

Sincerely,

Carol Barbero, PHR
HR Manager
7-Eleven, Inc.

# Exhibit F